62   29
63   348

GEORGE T. BROWN

*v.*

MARY G. BROWN.

[Submitted April 15th, 1901.  Decided May 25th, 1901.
Filed September 3d, 1901.]

1. In a suit for divorce for the wife's adultery, the testimony of two witnesses to acts of adultery, with that of others, showing a strong disposition of such wife and her alleged paramour to be in each other's company during the time specified, and frequent meetings, with opportunity for illicit indulgence, and acts of familiarity in kissing and embracing, &c., disproved only by a denial by the parties, supported by another person, who must have known of the improper intimacy, is sufficient to entitle petitioner to relief.

2. A husband knew that his wife had been visiting at the house of her paramour, who was a young man several years her junior, and knew that he was visiting her.  She had been married ten years, borne two children, and had not shown any disposition to go astray.  The father of such paramour warned such husband as to his wife's conduct several months before the commencement of the suit.  He did nothing to arrest his wife's course, but waited, observing and obtaining information, and on one occasion permitted such paramour to accompany her to a theatre, and spoke of him as her best man.  A detective was employed to watch them, and, shortly after a report of improper relations, suit for divorce for the wife's adultery was begun.—*Held*, insufficient to show connivance or acquiescence of petitioner barring a divorce, as he was justified in waiting to know the truth before acting.

On petition for divorce.  Final hearing on petition, answer and testimony taken before an examiner.

*Mr. Flavel McGee* and *Mr. Thomas F. Bedle,* for the petitioner.

*Mr. Isaac S. Taylor,* for the defendant.

PITNEY, V. C.

The petition was, filed on November 16th, 1898, and in it the petitioner charges his wife with several acts of adultery com-

mitted during the previous summer with one William H. Cane, Jr., at the village of Bogota, on the Hackensack river, opposite Hackensack, in Bergen county; at Red Bank, in Monmouth county, and at the residence of the petitioner, No. 82 Glenwood avenue, Jersey City. The adultery is denied by the defendant.

A mass of evidence was produced by the petitioner tending to show a strong disposition on the part of the defendant and her alleged paramour to be in each other's company during the period mentioned, and frequent meetings with more or less of opportunity to indulge illicit desires, if any they had, and acts of familiarity, such as kissing and embracing; and further, on two occasions, actual acts of adultery. These acts were all denied on the witness-stand in the most explicit and positive manner by the defendant and the co-respondent, and their denial is supported by other persons, who in some instances at least must have known of the improper intimacy, if it existed.

It may be said, generally, of the evidence, that it is contradictory to a painful extent. That on the part of the petitioner comes mainly, with two notable exceptions, from the mouths of domestic servants.

The proper weight to be given to the evidence under such circumstances induces me to consider at the start the indisputable facts of the case.

The petitioner and defendant are both natives, I believe, of the county of Hudson. Petitioner's father was the founder of a retail dry goods business in Jersey City, and the petitioner was connected therewith as an employe, and presumably had a large interest in the concern. The defendant's parents lived at Bayonne, in said county. They were married December 27th, 1888. At that time the petitioner was about twenty-one or twenty-two years of age, and the defendant about two years younger; so that the petitioner was past thirty, and the defendant about twenty-nine years old at the time of the occurrences covered by the testimony.

Two children were born of the marriage—George T., on August 5th, 1893, and Gordon, in January, 1896. In the spring of 1895 the petitioner rented a house in Bogota, and lived there with the defendant until December, 1896, and it was at that house that

their youngest child was born. In the same village lived the Cane family, consisting of a grandfather, William H. Cane, Sr.; his son, and head of the house, Frederick W. Cane, and the latter's son William H. Cane, Jr., the co-respondent, who was born in August, 1874, and was about twenty-one or twenty-two years old at the time the parties hereto lived at Bogota. Besides the grandfather, son and grandson, the grandson's sister, a Mrs. Van Keuren, with her husband, lived in the family and was the housekeeper. She had a daughter about the same age as the older Brown boy. The wife of Mr. Frederick W. Cane, the mother of the co-respondent, was living separately from her husband.

While the parties to this suit were living at Bogota they became acquainted with the Cane family, and the acquaintance ripened into an intimacy, which continued to the time of the bringing of this suit.

In December, 1896, the parties removed to Jersey City and occupied a house on York street until the spring of 1898, when they moved into a house on Glenwood avenue, on what is called the Hill, and one of the most desirable neighborhoods for residence in Jersey City.

In the summer of 1897, while living in the York street house, the defendant and her children and maid-servant, spent several weeks at Bogota, boarding with a Mrs. Brinkerhoff, and in June, 1898, she again went there with her two children and maid-servant and boarded with a Mrs. Ludwig until August 5th, when she went with her children and maid-servant, and with Mrs. Van Keuren and her child, to board with a Miss Bussell at Red Bank, on the shore of the inland tide waters which lead from Red Bank to Long Branch and its neighborhood.

It is clearly shown that both Mrs. Van Keuren and her brother, the co-respondent, visited at petitioner's house on Glenwood avenue in the spring of 1898; and when the defendant and her children went to board with Mrs. Ludwig, at Bogota, in June of the same year, she was a frequent visitor at the Cane house, and when not visiting there, that young Mr. Cane visited her frequently at the Ludwig house. Her husband visited her very seldom at that place. He never stayed over night.

Two notable facts arrest attentior in connection with the conduct of defendant while boarding ˙ th Mrs. Ludwig.

The maid-servant, Lizzie McCabe, ˙ ˈon whose testimony reliance is had for undue familiarity from the latter part of June to September 1st, swears—in addition to the other acts of familiarity to be mentioned hereafter—that one afternoon Mrs. Brown and young Mr. Cane went away on their wheels, and were gone the whole evening, and did not return until about two o'clock in the morning. It should be here observed that Bogota is about six miles north of the line between Hudson and Bergen counties, and that the county line is the northerly end of a boulevard which extends thence southerly fourteen miles or more through Bergen county to Bergen Point.

Further, the co-respondent, Cane, was at that time engaged in business in Hoboken. Now both Mrs. Brown and the co-respondent swear that, on the afternoon referred to by McCabe, they met by appointment about five o'clock, with their wheels, at a road-house at the north end, or top, I believe it is called, of the boulevard; that they rode together the whole length of the boulevard to a house of refreshment, called a shore-house, on the banks of New York bay at Bergen Point; that they arrived there about seven o'clock, took dinner there together, sat on the piazza with a crowd of other guests of miscellaneous character, such as patronize that sort of a house, listening to music and enjoying themselves, until—Mr. Cane says after ten, and Mrs. Brown says nearly eleven o'clock; that they then started for home on their wheels; that they were interrupted by showers and obliged to take shelter under sheds of various kinds; that Cane's wheel became disabled; that the roads were heavy, and that they arrived at Mrs. Ludwig's about two o'clock in the morning. They swear that they saw, and presumably were seen at the shore-house by, one of the solicitors of the petitioner herein.

Now I cannot but consider this excursion a most significant circumstance. Whether it would have been so frankly admitted but for the fact that they were seen at the shore-house by a witness who happened afterwards to be interested in making known the fact, is quite impossible to say. But the fact that

they do frankly admit ; does not detract from the significance of the transaction. It must be observed that the defendant was not lured unawares or oughtlessly into an act of indiscretion, but that it was done deliberately and by preconcert. I am unable to reconcile such conduct on the part of a married woman with purity of mind and purpose. Admitting that their story is true, and that no carnal intercourse took place between them that night, yet the question remains, why should a chaste married woman, with a due sense of her duty as a wife and mother, deliberately take such an excursion in the evening with a young unmarried man, in the absence of her husband? Surely such conduct indicates that the person indulging in it was ready to go farther in the same direction.

The next remarkable fact is that the father of the co-respondent, Mr. Frederick W. Cane, himself observed the intimacy which apparently existed between his son and the defendant. About the middle of July he spoke to his son in a reproving tone about it, and about the middle of August, after Mrs. Brown had gone to Red Bank, having occasion to meet the petitioner on business, apprised him of his wife's conduct, and told him that if he would go to Red Bank and observe what was going on there he would probably find cause for a divorce.

It is proper to state here that this was the first intimation, so far as the evidence shows, that was given to the petitioner of any improper conduct on the part of his wife. The allegation of the petition is:

"That petitioner and the defendant cohabited together as husband and wife until the 20th day of August, 1898; and since said date your petitioner has continued to live in the same house, but in a different part thereof, separate and apart from the said defendant."

The petition does not state why he entirely separated himself from his wife about the 20th of August, but it is fair to infer from the evidence of the elder Mr. Cane that the communication he made to the petitioner was the cause of his complete separation. The petition further states that the petitioner did not have absolute knowledge of the fact of adultery as charged in the petition until November 7th.

It is further an admitted fact that while the defendant and her children and maid-servant were stopping at the boarding-house in Red Bank with Mrs. Van Keuren they were visited almost every week by the co-respondent, and that the co-respondent went out bicycling with the defendant; that on one occasion the cycling party consisted of Mrs. Brown, Mr. Cane, Mrs. Van Keuren and a Mr. R.; that when luncheon time approached Mrs. Van Keuren and Mr. R. left Mrs. Brown and Mr. Cane, and went home to their boarding-house to luncheon, while Mrs. Brown and Mr. Cane, at the request of Mrs. Brown, went by themselves and took luncheon together at a road or shore-house, of which there are many in that neighborhood; and the four met again in the afternoon at Highland Beach for further amusement. Mrs. Brown says this separation of the party was at her request so that she could get a square meal. Neither she nor Mr. Cane give any identifying description of the house at which they took their luncheon. This occurred on Labor day, September 6th, and on that day Mr. Brown went to Red Bank to see his wife and children, and saw only the latter.

It further appears, and is not disputed, that after the defendant returned to Jersey City, Cane was a frequent visitor at defendant's house, and from that time until November 1st; that during the same period the defendant on several occasions visited Mrs. Van Keuren at her house at Bogota, where she was then living separate from her father; that defendant spent the night there on several occasions, and on one occasion stayed from Saturday night until Monday morning, and that on those occasions she was visited by the co-respondent.

With this preliminary statement we come to a closer examination of the evidence of the witnesses. But I wish to say, with regard to the most important witnesses for the petitioner, that I am somewhat embarrassed in weighing the value of their evidence, by the fact that it was taken in longhand by the master, and an attempt was made to follow the rule requiring the evidence to be, taken in a narrative form. Some of the witnesses are illiterate and have a poor command of language, and the evidence cannot be read without suspecting that the exact idea

of the witness may not have been preserved or even obtained by the master.

The first witness, in point of time of observation, is *Miss Maggie Meehan,* who was a servant in the family of the petitioner during the latter part of the time of their living in York street and the first part of their living in Glenwood avenue, namely, the latter part of the year 1897 and the first part of the year 1898. She swears that during that time Mrs. Brown went to Bogota several times, say once in two or three weeks, and usually stayed over night at Mr. Cane's house, where Mrs. Van Keuren was then living. The witness left the Browns in June and went to live with the Cane family at Bogota, and she swears that when Mrs. Brown and her children came there to board at Mrs. Ludwig's (June to August, 1898) she was at Mr. Cane's house a great deal.

Another witness, a *Miss Roe,* swears that she was a servant in the Cane house at Bogota, and that in the spring, commencing with March, 1898, Mrs. Brown came there frequently; sometimes she would stay all night, and sometimes two nights.

These witnesses are fully corroborated by the evidence of Frederick W. Cane as to the frequency and length of Mrs. Brown's visits to his house.

The next witness is *Lizzie McCabe,* who went to live with the Browns at Jersey City about the middle of June, 1898, as nurse-maid. A week later she went with Mrs. Brown and the children to live at the Ludwig boarding-house at Bogota. She swears that when she first went there Mrs. Brown spent her evenings at Mrs. Van Keuren's; that that practice continued for two or three weeks, and after that she spent her evenings at home. Here she is corroborated by Mr. F. W. Cane, who swears that Mrs. Brown spent most of her time about that period at his house; that the practice became so annoying that he spoke to his daughter, Mrs. Van Keuren, about it, and requested that it be discouraged; and the fair inference is that it was discontinued, as testified to by Miss McCabe. The witness McCabe swears that during the latter part of the five or six weeks spent at Mrs. Ludwig's, Mrs. Brown began to remain at home, and the co-respondent came there frequently, almost every evening;

that some nights he stayed until after ten o'clock, and sometimes until after eleven; that she saw the defendant and Cane sitting together in the hammock on the piazza, and saw his arms around her waist; sometimes they sat together on a bench on the piazza as close as they could get; the piazza was somewhat shaded by a vine, and had no light except that which came from the street light in front of the house. She swears that she saw Cane kiss Mrs. Brown good night, and that on one evening, after eleven o'clock, the two left the piazza and went into the parlor where there was no light and stayed there some time. The witness went to bed, and was still awake, however, when Mrs. Brown came upstairs. When Mrs. Brown came up she went to the bathroom and took a syringe with her. On cross-examination she stated, and I think satisfactorily, how she was able to see and observe the close familiarity between the defendant and the co-respondent at Mrs. Ludwig's house.

She then swears to visits of the co-respondent to the Red Bank house, which was kept by a Miss Bussell, where the defendant and her two children spent the month of August with Mrs. Van Keuren and her child. The petitioner came to Red Bank on three or four Sundays, and once on Labor day in September, but never stayed over night; came in the morning, or at noon, by boat or train, and went back the same evening. The co-respondent visited that house nearly every Sunday, and on two or three occasions stayed from Saturday till Monday, and on one occasion over night. The witness swears that Cane came to visit Mrs. Brown.

And here it is necessary to introduce a painful feature of the case. I have spoken of W. H. Cane and sister, Mrs. Van Keuren. Mrs. Van Keuren had a friend, a Mr. R., a widower, who visited her frequently at her father's house in the absence of her husband, Mr. Van Keuren, so much and so often that when she went the first week in August with Mrs. Brown to Miss Bussell's, at Red Bank, her father told her that she must not come back to his house again to live. He swears that the reason for that action on his part was that she was receiving visits from another man—R.—in the absence of her husband.

At the same time that Mrs. Brown was receiving visits from

the co-respondent, at Bussell's, at Red Bank, Mrs. Van Keuren was receiving visits from Mr. R. He was there about one Sunday oftener than the co-respondent; and Miss McCabe swears that they paired off; that R.'s visits were palpably made to Mrs. Van Keuren and that Cane's visits were palpably made to Mrs. Brown. This is denied by each of the four.

I think the clear weight of the evidence is, notwithstanding its attempted contradiction, in favor of Miss McCabe's view.

I may as well stop here to say that, while all the parties— R., Mrs. Van Keuren, Mrs. Brown and the co-respondent— deny that the visits of these gentlemen were directed to any particular female, they admit the circumstances above stated, namely, that the four went cycling in the forenoon of Labor day, and when it came time to go home to luncheon Mr. R. and Mrs. Van Keuren paired off and left the others and took luncheon at a roadside house by themselves, and then the four met by appointment at some place in the afternoon to spend the evening together. On this occasion Mr. Brown was expected to visit his family and did come to Red Bank, but did not find Mrs. Brown. Besides, Mrs. Van Keuren admits that she went out carriage riding alone with Mr. R. ,

Then Miss McCabe swears that on one Sunday, at Red Bank, about three o'clock in the afternoon, when the four—R., the co-respondent, Mrs. Van Keuren and Mrs. Brown—were sitting on the piazza, the two gentlemen were each lying in a hammock, one on each end of the piazza, and that Mrs. Van Keuren was sitting close to Mr. R. and Mrs. Brown was sitting close to Mr. Cane; that Miss Bussell, the keeper of the house, was lying on the grass under a tree, and that the witness was near at hand; that Mr. Brown made his appearance walking from the train, and was first seen by Miss Bussell, who at once spoke out and greeted him—"How do you do, Mr. Brown"—in a loud voice, in such a manner as to warn the parties on the piazza, and that they changed their positions promptly before Mr. Brown came within sight of them.

Now this is denied by the two men and the two women implicated, in this wise: they swear that the situation was substantially as stated by Miss McCabe, except that Mr. R. was

sitting by the side of Mrs. Brown and Mr. Cane was sitting by the side of his sister, Mrs. Van Keuren.

Taking the story altogether, and in connection with the other facts in the case, I am satisfied that Miss McCabe's version is the true one, and that the other parties just mentioned have, to say the least, prevaricated.

This witness further states that on one occasion at Red Bank she came in from an outing one Saturday evening, about quarter to ten o'clock; that Mrs. Brown and Mr. Cane were on the piazza; that Mrs. Brown called to the witness to bring her her hat, and she gave it to her, and that the co-respondent and Mrs. Brown went out walking together. At what time they returned she does not know.

She further swears that on one occasion she wished to write a letter and used Mrs. Brown's writing materials in her room, and she found some unevenness in the pad upon which she placed her paper, and lifting it up found an unfinished letter written by Mrs. Brown to the co-respondent; that the letter commenced with "Dear Will," and stated that she had his photograph on her desk and every time she sat down she thought of him, and she said, "Dear Will, do you think of me as much as I do of you?" and that the letter spoke of money; that Mr. Brown did not allow her as much money at Red Bank as he did at Bogota; and she understood the letter to speak as if she had been giving Mr. Cane money.

The writing of letters by Mrs. Brown to Mr. Cane is not denied, but Miss McCabe's statement of the contents of the one she saw is denied by Mrs. Brown and by Cane.

On one of the last Sundays in August, probably the first one after the petitioner had received the warning from the co-respondent's father, he, petitioner, went to Red Bank (being the same occasion just referred to), and arrangements had already been made for the whole party—Mrs. Brown, Cane, Mr. and Mrs. Van Keuren and R.—to go out sailing that afternoon; that after petitioner had been at the house a little while the sailing party started out, and petitioner was invited to go with them. He declined to go, but the defendant, notwithstanding the fact that her husband had apparently come to see her and

was going back the same evening, preferred to go out sailing, and did go—Mrs. Van Keuren in bathing costume—and did not return until nearly nine o'clock, just as he was about to leave for the train to return to Jersey City.

Mr. Brown was not sworn as a witness, but it is fairly inferable from the facts that on that Sunday afternoon, while defendant was out sailing, he questioned the witness McCabe as to the conduct of his wife, and that he requested the witness to call on him when she came to New York. At any rate, towards the last of the month Mrs. Brown found in McCabe's room an unfinished letter which she was writing to a friend in which she spoke of Mrs. Brown's conduct with Cane. The witness McCabe says she also spoke in that letter of the conduct of Mr. R. with Mrs. Van Keuren; but this part of the letter is denied by Mrs. Brown. The latter swears that when she found that Miss McCabe was writing in that manner about her she "thought she was playing as a spy; so I told her she could pack her things and go, because I didn't care to have such a girl in my house any longer." The latter reason is quite sufficient; but why, if she was perfectly innocent of any improper conduct, she should object to having a spy about is not so clear. Miss McCabe swears, and Mrs. Brown admits, that she had asked her before this whether she had seen anything wrong in her behavior, and that McCabe had said she had not.

Just here it is to be noticed that it plainly appears that Mrs. Brown and Mrs. Van Keuren knew while at Red Bank that Mr. Brown suspected his wife of improper conduct. They had undoubtedly heard of Mr. F. W. Cane's warning to Mr. Brown, already referred to.

Now the evidence of this witness McCabe is only important as showing the great familiarity and improper conduct, in the way of kissing and so forth, between these parties. She proves no direct act of adultery; and if her evidence stood by itself, contradicted as it is by the four parties, it would perhaps not have much value. But such as it is, her character has been attacked with great fierceness, and declarations that she has made to third parties have been admitted in evidence with great freedom.

It is proper to remark at this time that Mr. Brown, while his wife was at Bogota and Red Bank, did not occupy his own house, but took a suite of rooms in Ninety-third street, New York. There is no direct proof of this, but it is admitted by counsel, and it was excused on the ground that a high flat in the upper part of the city of New York was as cool and pleasant a place as a business man could find anywhere about New York, and was sufficiently convenient to his place of business in Jersey City.

It is testified that the witness McCabe said to a third party that she went to New York, called on Mr. Brown at his lodgings, that he treated her kindly, took her out to supper and to the theatre, and that he furnished her a spare room to sleep in at his flat in New York City. This was denied by the witness on the stand, and there is no kind of proof of it as against Mr. Brown. But it is testified by several witnesses that she made that statement, and that she said she would get even with Mrs. Brown for discharging her, that she would ruin her, and expressions of that kind. Now I think that it may be fairly inferred that the petitioner did treat this witness kindly, in order to induce her to tell him what she knew about his wife's conduct. He had recently been warned by the co-respondent's father that his wife was liable to go astray, or had already gone astray; and he was entirely justified in wishing to assure himself of the fact.

Other contradictory statements made by the witness McCabe are testified to; so that, if the case stood alone upon her evidence, as I have remarked, and she had testified to more positive acts between these parties, I should not deem it safe to rely upon her evidence as a basis for a decree of this court; but I am bound to say that the general impression left upon my mind by a careful study of the evidence, and after hearing the counsel for the defendant in a most able and elaborate argument, occupying two or three days, is that her evidence is, in the main, true. It does not seem to me to be manufactured. You cannot properly judge of the probability of the general truth of her evidence without taking into consideration the admitted facts I have previously stated, to wit, the night ride of twenty miles to the shore-house at Bergen Point, and the remarks upon her

conduct made by the father of the co-respondent, and other admitted facts in the case above stated.

It is proper to remark of this witness and four other witnesses relied upon by the petitioner, whose evidence will be referred to directly, that they were called and sworn and gave their evidence before Mr. F. W. Cane and the witnesses of the defendant were sworn, and the witnesses of the petitioner, just referred to, could not have known what either Mr. F. W. Cane or the witnesses of the defendant would testify; and yet in many respects they are corroborated in a rather remarkable manner by the later testimony.

This brings us down to the time of the return of Mrs. Brown and her children to their Jersey City home on Glenwood avenue. A short description of the house will enable us to understand the evidence as to the occurrences there. It was a basement house, with dining-room, kitchen and laundry in the basement, so that, in the language of the servants, everything above that was "upstairs." On the main floor was an ordinary vestibule, leading to a hall on the left side of the house as you enter, extending nearly through the house; on the right of it two parlors, and in the rear of those a third room extending across the whole width of the house including the hall, and with a door leading from the end of the hall directly into it (at this point also was the door leading to the basement). These three parlor rooms were separated by sliding doors; that between the back parlor or centre room and the third room being narrower than that between the two parlors proper. There were two floors of sleeping-rooms above the parlors. The house, as I understand it, is situate on the corner of Glenwood avenue and the boulevard, so that it is open on two sides, and across the rear is a narrow piazza or balcony, with steps leading to it from the ground.

The first witness as to the occurrences at this house is *Rose Leary*, who came there to live on the 8th of September, 1898, the first day of its occupancy after the return of Mrs. Brown from Red Bank, and remained there until October 14th. She was cook and laundress. The only other servant was the chambermaid and nurse, who during that time was Miss Maria

Mitchell. Both of them were new servants engaged by Mrs. Brown.

Miss Leary swears that during the five or six weeks that she lived there Mr. Cane visited Mrs. Brown frequently, as often as twice a week, in the afternoon, came about half-past three and left about five o'clock, Mr. Brown being away from home. She said that on Friday afternoons—she mentions Friday particularly—after Georgie, the elder boy, then five years old, had returned from school, the nurse would be out with both the children, and that Mr. Cane would come to the house to visit Mrs. Brown when there was nobody in the house but herself and Mrs. Brown. She says that one afternoon, about the hour that little Georgie was expected from school, she, the witness, was in the front areaway to let Georgie come into the house by the basement, and that when he arrived Mr. Cane also arrived and went up the steps to the front door and rang the bell, and that the child, instead of entering with her, went up the steps with Mr. Cane, saying he would go in that way. That when she, the witness, in answer to the bell, got part way up the basement stairs Mrs. Brown called to her and said that she herself would go to the door, and she heard the door open and Mr. Cane enter; and that shortly after Maria and the children came into the basement, and Georgie had twenty cents in his hand, and handed the money to the witness and said, "Here is your money." The witness said, "No, that is your money, Georgie; your papa gives it to you for going to school." The child answered, "No, this is not my papa's money; my mamma gave me this money to go out when my uncle Will Cane came in."

This evidence was objected to as hearsay; but it seems to me that it is an exception to the rule against such evidence, and that such conduct and language coming from an innocent child, five years old, has some weight. Counsel for petitioner asks, from whence did the child get the money if not from his mother? And for what purpose was it given to the child? Mrs. Brown contents herself with simply negativing this question:

"*Q.* Did you ever give to your child Georgie any money to go out of the house when Will Cane was at the house?

"*A.* Never."

Miss Leary further says that one evening she came into the kitchen and found Maria Mitchell sitting in the kitchen, and that Maria commenced to cry, and acted as if she wanted to tell the witness something; and the witness said, "Maria, don't tell me." She gave as a reason for saying this that she did not want to hear what Maria might say, because, as she said at the time, "we would all be arrested." Asked on the stand what she meant by that, she said that she knew Mr. Cane used to go to see Mrs. Brown, and that she thought Maria had seen something wrong, she cried so hard—could hardly speak—and that she never spoke of it afterwards.

The importance of the evidence of this witness lies in its tendency to prove that Cane came to the house in the afternoon when Mrs. Brown was alone and her husband not only absent but not expected. It may be said generally of her evidence that it is free from any appearance of having been made up after conference with any of the other witnesses, or with counsel. Upon the whole, I am not able to find any reason for disbelieving this witness.

The next witness is *Maria Mitchell,* who came to live with the Browns as nurse, chambermaid and waitress—they kept but two servants—at the same time that Leary did, September 8th or 9th. Both she and Leary appear to have been strangers to each other and to the Browns. She remained at the Brown house continuously from that time until her testimony was taken.

She swears that Cane came to the house two or three times a week, and sometimes he would come in the afternoon, but for the most part in the evening, sometimes while Mr. Brown was at home and sometimes while he was not at home. Brown was never home in the afternoon, except on Sunday. And here it is proper to say that Mr. Brown always came home to luncheon and to dinner, but would usually leave the house after dinner, go back, professedly and presumably, to his place of business, and would reach home as late as midnight, and sometimes later.

In order to properly understand Maria Mitchell's evidence,

it should be said that on Saturday evening, October 1st, and on Saturday evening, October 15th, Mrs. Brown, by the permission of her husband, went to the theatre in Newark under the escort of Cane, the party consisting of the two; that some time about October 4th or 5th, a Mr. Coyne, a witness, whose testimony will be referred to later on, was employed by one of the solicitors of the petitioner to watch his wife and the co-respondent, and that, on the night of October 15th, he accompanied them, without their knowledge, to the theatre in Newark, and afterwards returned to the house, and testified, as will be seen hereafter, to what he saw on that occasion.

Now Mitchell testifies to several important matters. One is that Mrs. Brown and the co-respondent would visit each other in the evening, in the third room of the parlor floor, and that twice on Mr. Cane's visits she was called by Mrs. Brown and required to procure a cup or pitcher of hot water, which Mrs. Brown took from her hands and went upstairs to the bathroom, staying there a few minutes. This was while Mr. Cane was in the house.

Mrs. Brown admits that she did, on one or more occasions, call for hot water, but she said it was not for the purpose of use in the bathroom, as suggested by Maria Mitchell, but to be drunk as a remedy for indigestion; and she swears that she never called for it while Mr. Cane was in the house. She says there was hot water in the bathroom, so that there was no occasion for its carriage to that room. Several suggestions are made by the counsel of petitioner against this view. One is, that during the latter part of the evening, the water in the bathroom might not be warm; and another, that there was no occasion for Mrs. Brown to take the water up another flight of stairs in order to drink it as a remedy for indigestion; and still another is that, if she wished merely to drink the water, why was it not served to her in the ordinary way—in a drinking glass on a waiter?

Another important matter to which she testifies is to overhearing telephone communications between Mrs. Brown and Mr. Cane. With regard to these she was unable to say what she heard, except that Mrs. Brown called Cane "Will, dear."

She further testifies that she heard Mr. and Mrs. Brown speak-

ing about Mrs. Brown's visits to Bogota, and Mr. Brown object-
ing to them.

She further specifies that on one of the visits to the theatre
it was about eleven o'clock when Mrs. Brown and Cane reached
the house; that Cane came in with Mrs. Brown, and that it was
after twelve o'clock when Cane left, and that Mr. Brown was not
in the house.

But the important matter to which she swears, in addition
to those just mentioned, is this—and it may be premised by say-
ing that it is perfectly plain that both the servants observed the
intimacy between Cane and Mrs. Brown, and their conduct and
evidence must be considered in the light of their state of mind
in that respect—that on one occasion when Mrs. Van Keuren
was visiting Mrs. Brown, Mr. R. and young Mr. Cane both came
there to see them in the evening (Mr. Brown was not at home),
and that the four were in the suite of rooms constituting the
parlors, visiting each other; that late in the evening she, in
passing along the hall, observed that Mr. R. and Mrs. Van
Keuren were in the front parlor, and that she did not see there
Mrs. Brown and Mr. Cane. She says that she had an errand
with Mrs. Brown, to take some order for breakfast; that she
walked down the hall and came to the door at its rear end, which,
as we have seen, opened directly into the third room, being that
part of the third room which was in the rear of the hall and
not visible from the front parlor; that the door was ajar; that
she pushed it partly open, and found Mr. Cane and Mrs. Brown
in the act of adultery, on a lounge which, confessedly, stood im-
mediately opposite that door. The witness is somewhat stupid,
very illiterate, cannot read and has a poor command of language.
Asked what they were doing, she said they were "sleeping with
each other." She says she only looked a moment, saw what was
going on, and immediately retired, without making her presence
known. On cross-examination she was pressed severely to say in
explicit words what Mrs. Brown and Cane were doing, and she
became angered because the counsel pressed her on that subject,
and apparently because he pressed her with other questions which
seemed to her unnecessary, and refused, in fact, to answer, and
generally showed her lack of intelligence and appreciation of

her duty as a witness. Except for that sort of misbehavior on the stand, and for the fact that, at the time of the giving of her testimony, she was still in the employ of Mr. Brown, I find nothing in the case to impeach her testimony. On the contrary, I find a disposition on her part to tell the truth, and I much doubt her capacity to manufacture a story such as she details.

Her story is denied *in toto* by the four parties implicated—Mr. R. and Mrs. Van Keuren, Mr. Cane and Mrs. Brown. They all swear that nothing of the kind ever happened. And it is here to be remarked that, while an accurate plan of the rooms, as produced to the court, shows that the point where Maria Mitchell swears she saw the act of adultery was not visible from that part of the house where the witness locates Mr. R. and Mrs. Van Keuren, yet the whole case, in not only this, but another act of adultery testified to further on, shows that Mrs. Van Keuren must have been cognizant of whatever was going on between her brother and Mrs. Brown.

The witness Mitchell is unable to fix with certainty the date of the occurrence just referred to. She is uncertain whether it was in September or October, but thinks it was in October and after the visit of Mrs. Brown and Cane to the theatre at Newark. Now there were, as we have seen, two such theatre visits, namely, one on October 1st and the other on October 15th. The first occurred while Rose Leary was serving as cook and laundress. Mitchell swears that she thought the cook was out at the time it occurred. She swears that she went downstairs to the kitchen after seeing what she did, and sat in the kitchen, but that she was not crying. She does not say that she did not cry after the cook came in.

Now, if the date of the occurrence was after the first theatre visit, and before the second, it occurred during Rose Leary's time, who left on October 14th, and it is probable that it did occur during that period, because the witness herself is uncertain whether it was in September or October. If it occurred while Rose Leary was cook, then it is quite consistent with the latter's evidence that Maria Mitchell commenced to cry when she (Rose) came in and found Mitchell in the kitchen. And it may be remarked of the evidence of these two witnesses, as to the occur-

rences of this evening, that it is quite plain that there was no pre-concert between them, and it shows no disposition on the part of either to manufacture evidence, but the contrary. It further appears from the cross-examination of Mitchell that the first person she ever told what she had seen was one of the solicitors of the petitioner, after the suit was commenced.

Here, again, the remark must be made that in judging of the probability of the truth of this evidence, all the other circumstances of the case must be taken into consideration—the persistent intimacy between the parties, the manifest desire to enjoy each other's society and the frequent visits of Mrs. Brown to Mrs. Van Keuren at Bogota, while she was keeping house there, between September 7th and November 7th.

The next witness is *Rose Sexton,* who was employed by Mrs. Brown as cook and laundress, commencing on the morning of October 15th, 1898, and continuing up to the time of the taking of her testimony, which commenced on January 10th, 1899. Miss Sexton relates what occurred on the evening of October 15th, the first day she was there, and the second evening that Mrs. Brown and Cane went to Newark to the theatre together, when they were watched by the witness Coyne. She says that she sat up in the evening in Mrs. Brown's room taking care of the children, in relief of Maria Mitchell, the nurse, who was out visiting, until eleven o'clock, when she went to her room but not to bed; that she heard Mr. Cane and Mrs. Brown arrive, and that she sat up until after Cane left. She says that Mrs. Brown and Cane came home at quarter-past eleven, and that he went away about quarter-past twelve o'clock. She swears that there were no lights in the parlor, at eleven o'clock, just before they got home; that there was a light in the hall which shone into the parlor. The plan of the rooms, with the location of the gaslights, shows just what the effect of that light would be upon the parlors. It would shine through the rear part of the front parlor into the central room or back parlor proper, but would not reach, with any degree of illumination, the third room. She further says that Mr. Brown had not come home and was not in the house at the time Cane left. According to her evidence

Cane was in the house with Mrs. Brown, in Mr. Brown's absence, very nearly an hour.

She further swears that Cane was there one Saturday afternoon two or three weeks after she went there, and that he came there by appointment made by Mrs. Brown over the telephone; that she heard Mrs. Brown answering the telephone, and she said to him he could come about half-past three in the afternoon; that the appointment was made in the morning, and that Mrs. Brown was called up over the telephone and the witness heard her say, "Is that you, Will?" that she did not of course hear any reply, but that she heard her laugh.

That she heard several talks between Mrs. Brown and Mr. Cane over the telephone. At one time she asked him to come and spend Sunday afternoon, and that she said:

"What, you can't come? Well, I won't take no for an answer. Oh, you want to be shook, then? Oh, very well, then I'll shake you just as soon as you want to be. Did you get my letter? Why, I wrote yesterday. Well, you tell 'Gert' to show you my letter."

(Gert was the little daughter of Mrs. Van Keuren.)
Another talk over the telephone was this:

"Well, I am not coming because George objects. Aha, I wonder what's up? No. I am coming next week, though. No, I can't come to-day because I'm going to the theatre this evening with George."

She addressed him as "Will, dear." And further in the talk she said, "I am coming next week, be sure and meet me there. I am going to bring Georgie this time when I come, for a blind." Another talk that she recollects was:

"How is it that you stay away so long? It seems an age since I seen you. Well, I want you to come up for I want to see you; I have something very important to tell you. No, really, it's no jolly. No, I can't possibly tell it to you over the telephone, you must come. Very well, I will expect you between three and half-past three. But come down on your wheel, if it's pleasant; come rain or shine."

Another occasion was: "Why are you afraid; I am always alone?" That Georgie was downstairs and went up and said,

"Who are you telephoning to, mamma?" That she said, "Oh, keep still, I am talking to Uncle Will;" and then she said "Goodbye."

That Mrs. Brown went to spend Saturday night and Sunday night with Mrs. Van Keuren, on November 5th or 6th, and then returned; and on Monday the witness heard a conversation between her and Mr. Brown in which she learned that election day would be a school holiday; and then she remarked to her son George, "Georgie, we might as well have stayed. If we had known there would be no school we could have stayed." And she said: "I guess we will pack up and go back again, Georgie." She did go to Mrs. Van Keuren's again on election day.

Then it appears that on November 14th or 15th Mr. Brown announced to his wife that he should commence suit against her for a divorce, and this witness heard, through the door leading from the kitchen to the dining-room, Mrs. Brown say "it was a mean, contemptible thing, and I will go home to mamma and papa this very night;" that she heard her after that telephoning to Mr. Cane—"You will stand by me, won't you? Will your father stand by me? Oh, oh, don't tell me that. Why, how are you, pretty well under the circumstances?" Then farther on she adds this to her evidence: "She asked whether the father would take back what he said?"

These telephone conversations are, as to these details, admitted in part and denied in part. I consider them quite significant when taken in connection with the facts which are either admitted or proven beyond dispute. And considering that this witness was examined before any of the witnesses of the defence and before the elder Cane were called, I find it impossible to believe that they were manufactured by either the witness who detailed them, or by anyone for her use. The importance of the evidence of this witness lies, first, in the language of the telephone communications; second, in the fact that Cane visited Mrs. Brown at her home when her husband was absent and not expected, and third, in the occurrences of Saturday night, October 15th, which will be presently dealt with.

The family and previous history and surroundings of this witness were fully disclosed by her cross-examination, and were

above reproach. An attempt was made to show that she asked for employment by Mrs. Brown at the instigation of Coyne, whose evidence will next be considered, and with the object of acting as a spy on Mrs. Brown. I think the attempt failed. She was seeking employment and accidentally heard that Mrs. Brown needed a cook. She did not know where Mrs. Brown lived, but happened to be acquainted with Mrs. Coyne, the wife of the witness Coyne, and knew her husband was a night watchman, and inquired after Mrs. Brown and was informed by her where Mrs. Brown lived. She knew Coyne to speak to him only. Both Coyne and Sexton swear that the notion that she sought employment at his suggestion or she was engaged to watch Mrs. Brown is without foundation.

The next, and perhaps the most important, witness is *Mr. James A. Coyne.* He was formerly a salaried police officer in Jersey City, and described himself on the stand as a special officer, who was stationed in the neighborhood of Glenwood avenue and the boulevard, within certain limits, appointed by the city authorities, and paid by the residents as a night watchman. The truth of his account of himself was not questioned, nor was his general character attacked. It seems to be, in a measure, sustained by the fact that he was employed as a night watchman by a highly respectable class of citizens, who would be likely to be quite particular as to whom they so employed. The only matter urged against his reliability was that he was willing to serve as a sort of detective to watch Mrs. Brown.

He swears that, about the 4th or 5th of October, he was employed by one of the solicitors of the petitioner to watch Mrs. Brown and Cane; that he saw Cane going into and coming out of the Brown house occasionally during the period that he was so employed; and on one occasion, which he speaks of as two weeks before the 15th, and, if so, before he was engaged to watch Mrs. Brown, he saw Cane go into the house with Mrs. Brown between eleven and twelve o'clock at night, and leave about ten minutes past twelve, just as Mr. Brown was going in. This was undoubtedly the occasion of the first theatre visit.

On Saturday night, October 15th, being informed that Mrs. Brown and Cane were going to Newark to the theatre, he got

on the same trolley car with them (and it may here be said
that it is about thirty minutes' ride from Brown's house to the
theatre, and the evening service is at intervals of fifteen min-
utes) ; that he followed them into the theatre, and stayed there
until they came out, but in the confusion due to the throng of
people he missed them, and, as it turned out afterwards, took
the next car.  He reached the house about half-past eleven or
quarter before twelve, observed a light in the hall when he
reached the house and nowhere else on the first floor, and after
reconnoitering the house and finding no mode of ascertaining
whether Cane was within, he reached the rear of the house and
went up the steps leading from the ground to the back piazza
or balcony, which runs along the whole rear of the house, and
there found that one of the shades, which were hung on the
three large windows opening from that third room on to
the piazza or balcony, was up a little way from the bottom.
He stooped and looked under it and saw that there was no
light burning in the parlors, and whatever of light there was
came from the hall light, a little in front of the door leading
from the hall into the front parlor.  The location of that light
is shown on the plan before alluded to, and it is plain that it
would throw a light diagonally across the front parlor into the
door space between the front parlor and middle or back parlor.
He says that he saw Mr. Cane and Mrs. Brown standing a little
way from the mantel in the middle parlor between that and the
passageway between the two rooms, and that he had his arms
around her and was kissing her.  The words he used are: "I
saw him embrace her and kiss her."  He immediately came down
from this stoop, because he thought Cane was about to leave, and
after a few minutes saw him leave.  He says this was about
quarter-past twelve, and that it was about half or three-quarters
of an hour later than that when Brown came home.

Taking the evidence of this witness, together with that of
Miss Leary and Miss Mitchell, it tends to prove that Cane and
Mrs. Brown got to Brown's house from between quarter to half-
past eleven; that they stayed in the house together until shortly
after twelve o'clock, when Cane left, and that Brown arrived
later.  So that Cane was in the parlor with Mrs. Brown, and

without any light, except what came into the room from the gaslight in the hall, for at least three-quarters of an hour, and that he was seen embracing and kissing her.

Now, if this evidence be true, it seems to establish quite clearly an adulterous act between them, because, taking all the other evidence in the case, it is quite impossible to believe that, with the opportunity that was there given for the indulgence of their passions, this man was embracing and kissing Mrs. Brown on that occasion unless he had either already had or was about to have sexual intercourse with her, for which there was abundant opportunity. And it must be remarked that it was clearly shown, and was a part of the defendant's case, that Brown was in the almost invariable habit of staying out in the evening, especially Saturday evening, until after twelve o'clock, and that the servants were both at home and upstairs in their apartment.

Now the account of Mrs. Brown and Cane of the occurrence is this: that they reached home a very few minutes before twelve o'clock; that Mr. Cane came into the house with Mrs. Brown and just stood there without sitting down for about five minutes, and that at the end of that time Mr. Brown came home; that Cane met him in the hall and had the usual evening greeting, was questioned as to what sort of a play they had had, and how they had enjoyed themselves, and that Cane left, and that it was necessary for him to go early in order to catch the train for his home, which train left Jersey City at twelve twenty-eight. It was not shown how long a period was occupied in going by the trolley from Brown's house to the ferry at Jersey City, nor was it shown how far it was from that point to the crossing of the Susquehanna railroad and the Delaware, Lackawanna and Western railroad, or to the station on the Pennsylvania railroad at the west end of the tunnel, or other nearest stopping point on the Susquehanna railroad. So that the precise time when it was necessary for Cane to leave the house in order to reach his home does not appear; but it may be assumed that it was twelve o'clock or shortly after. So that, as far as concerns the time of his leaving, which was fixed by Coyne and the two servants, it is not inconsistent with the time of his leaving to catch his train for Bogota. A variance from the true

time in the servant's clock would account for the time which they fixed, and Coyne does not fix it precisely. And then the period, five minutes or so, fixed by Cane and Mrs. Brown for his stay in the house, is entirely inconsistent with Mr. Coyne's evidence, because, confessedly, Coyne was at least fifteen minutes behind Mrs. Brown and Cane in reaching Brown's house, and then he spent some time in reconnoitering before he found the weak point on the back balcony or piazza; and then we have the evidence of Miss Leary that Brown came in much later. But then the question still arises, why should Cane go into the house at all, and why should Mrs. Brown invite him in? Was not his duty as an escort fully performed when he reached the house and saw Mrs. Brown fairly within the door? There was, confessedly, no light in the house except that in the hall, and nothing to invite him, nothing to talk about; and surely mere civility or courtesy did not require his entering.

But here it is worth while to revert to the visit to the theatre of two weeks previous. Coyne, as we have seen, swears that on that occasion he saw Mrs. Brown and Cane enter the house together between eleven and twelve o'clock, and that Cane came out a few minutes after twelve, and that he met Brown coming in as he came out. This state of facts corresponds almost exactly with the account of Cane and Mrs. Brown of what occurred two weeks later on the 15th.

The next matter testified to by this witness is. this: he was informed that on Saturday, November 5th, Mrs. Brown had gone with her boy, George, to visit Mrs. Van Keuren at her house in Bogota. He went to Bogota, reconnoitered the Van Keuren house, saw Mrs. Brown and Mrs. Van Keuren in the dining-room, apparently clearing away the dishes from the dinner table and saw Mr. Cane in the same room. This was about seven or half-past seven o'clock. He then left and went over to Hackensack and got a meal there and returned about quarter-past nine o'clock, and resumed his observations of the house. When he was there at about dinner time the lower part of the house was lighted up and there were no lights on the second or bedroom floor. When he returned the lights in the lower part of the house (with the exception presently to be stated)

were all out and there was a light on the bedroom floor. The
house has a hall running through the centre, with one or more
rooms on each side. To the right, as you face the house, is a
parlor and behind it is the dining-room. The parlor projects
farther towards the street than the other side of the house, and
this projection is matched by a piazza in front of that part of
the house which is to the left as you face it, and from the
piazza the door opens into the hall. On the left of the hall is a
very small room called by the defendant's witnesses, the "den."
I describe this room from a plan produced by defendant and
from the evidence of her witnesses. It has one window opening
on to the piazza, and immediately opposite that window is a
fireplace. In front of the door opening from the hall into the
"den" there is a window opening on the side of the house, which
is the north side—the house, as I understand it, facing to the
west. The door had been taken from the hinges, so that the
light from the hall shone directly into the room. To the right
as you enter the "den" was a small stand, upon which was a
lamp covered with a red shade. Further on, beyond the fire-
place, on the right, was a writing desk; opposite the fireplace
and against the window, which opened on to the piazza, was a
lounge; between the foot of the lounge and the door was a
rocking chair, and at the head of the lounge was a bookcase.
There was a desk, chair and two rocking chairs in the room.
There were shades drawn down against each of the windows.
Coyne chose to make his observations of this room from the
north window opposite the door. The shade that hung before
that window was produced and proves to be white, though
Coyne thought it slightly colored. This is accounted for by
the red shade over the lamp. Besides, by actual experiment,
I find that an ordinary gaslight gives it a slight pink tint.
If that window had been open he would have looked directly
lengthwise of the "den" towards the door leading into the hall,
and the divan would be on his right and the fireplace on his
left, and the lamp on the table by the hall door would be
almost directly in front of him. Standing on the ground he
was able to see the form of a man in the room. He removed
a piazza chair from the piazza, carried it around to the side

of the house under that window, and used it for a footstand,
and by that means was enabled to get his face close to the window;
but at his first close view he could see nothing in the room,
but could hear low conversation and laughing. When a person
walked across the room a shadow would be thrown upon the
window shade, and a person standing or sitting near the window
could be seen with more or less distinctness. When he first
assumed this position, which, as we have seen, was some time
after nine o'clock, he heard a peculiar creaking noise to his
right, apparently in what he called the northwest corner of the
room, but evidently in the direction of the lounge. There was
also low talking and laughing. After the lapse of about half
an hour a female took a seat in a chair very near the window,
with her side to the window, showing her profile. He thought,
from appearances, that she was in dishabille. Shortly thereafter
he saw the profile of the form of a man sitting near and directly
opposite her, with his face towards her, but the man was so
far out of the range of vision as to be only partially and at
times visible. Shortly after they had taken this position and
the low mumbling talk was going on, the words of which
he could not distinguish, the man leaned forward towards
the woman and the woman put one arm around his neck and
pressed his head down to her bosom, and stroked his hair
with the other hand, and said, "You naughty fellow," and
then they resumed a natural position, and some time after—
he thinks about half an hour—the man reached over and took
hold of the woman's arm as if to lift her up and pull her
out of the chair; that some slight resistance was made, but
finally he seemed to make a greater effort and partly lifted and
partly pulled her from her chair, and they disappeared from
view; again he heard some slight laughing and talking, but
could distinguish no words, and finally he heard this peculiar
noise which he had previously heard, which he called a noise
like the creaking of a bed or lounge. After that had continued
for some time the parties resumed their previous positions, the
woman in the same chair, with her side to the window, and
with the same effect of showing her profile on the window shade.
They sat there for some time, and after eleven o'clock Mr. Van

Keuren came home with some baggage and traps in his hands and entered the front door and turned to the "den" and said, "Mame, is that you?" (Mame was the familiar name by which Mrs. Brown was known in the Cane family.) She said, "Yes." He went upstairs and was gone some little time and then the occupants of the room, who turned out to be Mr. Cane and Mrs. Brown, came to the front door; Cane left; Mrs. Brown followed him a little way out of the door and kissed him goodnight. He saw and heard of no other person present on that occasion.

It was not disputed that, if this witness' evidence is reliable, one or more acts of adultery were then and there committed that night between Mrs. Brown and Cane.

By the consent of the parties I made a private experiment with this window shade, under circumstances as nearly as I could contrive similar to those testified to by Coyne, and found that a person, with his eyes near the window, could plainly distinguish through the shade the figure of a person at any point within two or three feet of the shade on the opposite side, the distinctness of the vision varying with the distance; and I find nothing in the test to throw the least doubt on Coyne's testimony. He could have seen all that he swears he did see; and it is worthy of remark that, when he testified, he could not have known that an experiment with the shade would result as it has.

Before stating the account of the transaction given by the parties implicated, I will state what occurred later. Mr. Coyne reported what he had observed to one of the solicitors of the petitioner, and on Mrs. Brown's return on Monday to her home Mr. Brown stated to her, as sworn to by the witnesses, that he was going away on election day and would not return until Wednesday night. Then it was she bethought herself that election day was a holiday, and, as we have seen, she proposed to her son, George, that she would go back and continue her visit with Mrs. Van Keuren. She did go back to Mrs. Van Keuren's on that day, without her boy, and stayed all night. Then a party was organized to go up to Van Keuren's and get more thorough and complete evidence. They went—the petitioner and a friend and Coyne. Coyne reconnoitered the premises, and found that Cane was not there. Late in the evening he met Cane riding

around on his wheel, and was recognized by Cane and charged with watching. The theory of the petitioner is that Coyne was observed on the previous Saturday night, and that the Van Keurens and Cane were on the alert. Without going into the details of that, and taking all the evidence together, I am satisfied that the petitioner's theory in that behalf is correct.

Now let us inquire what the answer of the defendant is to Coyne's story. The story of Mrs. Brown, Mrs. Van Keuren and Will Cane is that Mrs. Brown was there, as stated; that Will Cane came over to Mrs. Van Keuren's house after dinner; that he stayed there and spent the whole evening, until Mr. Van Keuren came home; that they were all three in this little "den" the whole evening, except a short time in the early evening while Mrs. Van Keuren was upstairs putting the children to bed; that Will Cane was lying on the lounge asleep or half asleep most of the time; that Mrs. Brown sat in the rocking chair at the foot of the lounge, and Mrs. Van Keuren was making herself comfortable in one part or another of the room. Among other things, they found the evening chilly, and lighted a wood fire on the hearth, the accomplishment of which occupied a good deal of time; that when Mr. Van Keuren came home he did come in and say, "Mame, is that you?" that he went upstairs and left his shooting traps—he had been on a shooting excursion; that in a few minutes he came down again, and then Mr. Will Cane took his leave; that his sister, Mrs. Van Keuren, went to the door and kissed him goodbye, and that Mrs. Brown did not kiss him, and that the whole story of Coyne is a fabrication.

Shortly after the failure of the election night observation— November 7th—and it was rendered almost certain that future watching would lead to nothing, one of the solicitors of the petitioner called on Mr. Van Keuren and asked him about the occurrences of that night, and he swears that Mr. Van Keuren told him that he got home about eleven o'clock; that he went into the house; that Will Cane and Mrs. Brown were in the "den" and that Mrs. Van Keuren was upstairs; that he went upstairs, stopped a little while, and then came down; that he observed a man watching the house. The main difference between the story that Van Keuren swore to on the stand and what he told the

solicitor of the petitioner being that he found Mrs. Van Keuren upstairs and that he saw a man watching the house. I cannot think that the solicitor of the petitioner is mistaken in this respect.

And just here I will state what Cane swears to on the subject of being watched and Brown's suspicions. He says that he first heard that Brown suspected his wife from Maggie Meehan (who left Brown's about the middle of June and went to live with the Canes) about the last of July or first of August, and notified his sister and Mrs. Brown at Red Bank; that it was from Meehan also that he first learned of Brown's contemplated proceeding against his wife (how Meehan could have heard or known this so early is not explained), and that he next heard it from his sister, who heard it from her husband. He further swears that before November 7th he had suspected that "Brown had some one on the case," and when he saw Coyne on election night he thought he was a detective, and therefore spoke to him. Now the case is bare of any evidence that Brown had ever breathed a word on the subject to any person except to F. W. Cane and to his counsel.

A week after that election night Mr. Brown announced to his wife that he should commence a suit against her for divorce, and the petition was filed November 16th.

Is the case made out? We have two witnesses swearing to witnessing two acts of adultery, and others swearing to acts of familiarity, which are the *indicia* of adulterous conduct. The admitted facts, as I have already said, show that mutual disposition existing between Mrs. Brown and Mr. Cane which leads naturally to criminal intercourse. The only ground upon which the evidence of these witnesses can be disbelieved is that some of the facts, including the adultery, are denied by the parties themselves and by Mrs. Van Keuren, who must necessarily have known of them.

I ought to say that a variety of little things, so small as not to be worth while to put in writing, in the evidence of all of the petitioner's witnesses strike me as indicating to a greater or less degree the truthfulness of their stories. Taking them

altogether, I am at a loss to see how such persons could have manufactured out of the solid the facts to which they testify.

I feel constrained, therefore, to say that the denial by the parties implicated does not raise in my mind any serious doubt of the truth of the petitioner's case.

To the case made by the petitioner, with which I have just dealt, defendant, in her answer, sets up a sort of a defence, which she in part supports in the evidence, and which is difficult for me to define, and yet I feel constrained to deal with it. It is set forth in these words:

"That there has never been any meretricious friendship or association whatsoever between the said William H. Cane, Jr., and this defendant, and whatever of association or friendship there has ever been between them has been with the full knowledge, consent, approbation, encouragement and instigation of the petitioner."

And further answering, this defendant says:

"That for a long period, and especially the last four years or thereabouts, the petitioner has habitually treated her with coldness, indifference and neglect; withdrawing and separating himself from her companionship and society, declining conversation with her, absenting himself from his home in the evenings and through many nights, refusing to occupy the same room with her and unmistakably evincing a constantly increasing hatred of her and desire to be rid of her, and his indifference to and neglect of her have been such and so great that, except as to the mere matter of her support and maintenance, he has in effect deserted her."

These allegations furnish no defence to the action. The utmost that can be said of them is that they set up a sort of connivance and encouragement by the husband. The petitioner objects to this view as not warranted. Be that as it may, if there clearly appeared in the case either connivance or adulterous acts by the husband, I should feel disposed to give them the same weight as if pleaded.

The answer further sets forth that for about three months before filing the petition the petitioner charged his wife with infidelity, without mentioning the name of any co-respondent, and that she denied it.

There is not the least proof that he ever charged her with

infidelity with Cane or any other person prior to November 15th.

The charge of neglect is supported only to this extent, that he spent most of his evenings away from home and declined to occupy the same bed with his wife for about two years before their separation. ·The reason he assigned to her for this was that the children disturbed him at night.

This practice of separate sleeping is quite common among married people who can afford it, and is not sufficient, standing alone, to show abstinence from sexual intercourse. Mrs. Brown does not swear that at any time before the summer of 1898 her husband refrained from sexual intercourse with her. All that she says in that respect is that he treated her coldly and not affectionately. She admits that he treated her courteously, kindly and with great indulgence, both as to her movements and expenditure of money.

I come to the conclusion that the defendant has failed to place the petitioner in the position assigned by Chancellor Zabriskie to the complainant in the somewhat famous case of *Derby* v. *Derby, 6 C. E. Gr. 36,* where, in speaking of the long-continued denial by the complainant of marital rights to his wife, he says (at *p. 39*) : "His gallantry and attentions to a few of the female members of the Fidelity Division might have been accounted for and excused by their common devotion to the important cause of temperance reform, if it had not been accompanied or followed by a total neglect of his duties to his wife. The neglect of a husband to perform his duties to his wife, *although it may be a natural and the real cause of her infidelity, will not justify or excuse it; it will hardly palliate the crime.* But a party who has negatively violated a solemn contract in its two most vital parts—to love and cherish—and has only performed it in the last and least—to support—comes into a court of equity with an ill-grace to complain of a positive breach by the party whom he first injured. His hands are not unclean in the sense which would apply if he had committed the same crime, but they are so weakened, blanched and attenuated by willful non-performance that they take but feeble hold on the horns of the altar of justice. Such a complainant cannot expect any favor-

able leaning of the court, but must present a case free from any reasonable doubt."

The defendant at all times occupied her natural position as the mistress of her house, with all the authority and dignity belonging to it. She was permitted to have her father and mother to live with her up to the summer of 1898.

There was, indeed, some jarring between the parties, leading to some unhappiness about two years before their separation, but the details of it given by Mrs. Brown show no violence or even verbal abuse by her husband.

The occasion of this unpleasantness, as stated by Mrs. Brown, was her husband's undue attention to Miss Welanitz, a very young lady, who was at one time employed as cashier of Mr. Brown's store. The defendant does not by her answer charge adultery between her husband and this young woman, or any other person, and her counsel put her distinctly upon record before the master and in argument as disavowing any such charge. Evidence was gone into of his attentions to Miss Welanitz, and it was used in argument. According to Mrs. Brown's evidence Miss Welanitz was a bright and well-mannered girl, who attracted the attention of her employer and was admitted by him and by Mrs. Brown as a welcome guest in their house until Mrs. Brown observed, as she thought, that Miss Welanitz was manifesting an admiration for her husband, and that he was paying her more attention than Mrs. Brown thought was proper, when she managed to revoke the standing invitation she had previously extended to Miss Welanitz to visit her house. Mr. Brown then advanced Miss Welanitz the funds necessary to enable her to take a course in the State Normal School to qualify her for a public school teacher, and at the time covered by the evidence—the summer of 1897 and 1898—she was actually working as such teacher in a public school at New Durham, Bergen county. The proof is that Mr. Brown occasionally visited her there at her boarding-house, under circumstances which hardly suggested any improper relations between them. Her ambition to be a school teacher, and her settling down to follow her profession in a quiet country town and boarding in a respectable family, are all circumstances indicating a pure

mind, and the bringing of her name into this cause ought not to affect her character in the least.

We come now to the charge of connivance and encouragement to Cane.

The only basis of truth as to the petitioner's encouragement of Cane's visits to the defendant is in the fact that he was aware, generally, that she was visiting Mrs. Van Keuren and the Canes, and that they were visiting her; but there is no evidence to show that he had any suspicion that his wife was over-intimate with Cane or anyone else prior to the time that Mr. Frederick W. Cane gave him the warning, about the middle of August, 1898, when his wife and children were at Red Bank.

His conduct from that time on requires more serious consideration. He did nothing to arrest his wife in her downward course and the serious question is, was it his duty, under all the circumstances, to do so? Let us consider the circumstances.

His wife was nearly thirty years old, had been married ten years and borne two children, and had not been reared or lived in seclusion. On the other hand, she was, so to speak, a woman who had had experience in society and the ways of the world and was quite able to take care of herself and not liable to be led astray by a designing man, much less a boy four or five years her junior. She never had, either before or after her marriage, so far as appears, shown any disposition to go astray.

The case, in this aspect, is in marked contrast with that of a husband with a young inexperienced wife of passionate temperament and weak will, who would be likely to yield either to a sudden temptation or to an insidious approach and was such an one as required careful attention and protection against her own weakness and inexperience. In such a case the courts have held it to be the duty of the husband to watch and protect the wife against temptation.

Then we must consider what it was her husband learned from Mr. Frederick Cane. He says he went into Brown's store to pay a bill, and as he was leaving he told Brown that it would be advantageous to him to look a little more after his wife; that he should go down to Red Bank where she was stopping and that he might there find reason for a divorce. He said on

the stand that his reason for this was that Mrs. Van Keuren, Mr. R. and Mrs. Brown were staying there together, but he did not give this reason to Mr. Brown, nor did he mention his son's name.

Now what inference ought Mr. Brown to have drawn from that warning? He knew that Mrs. Brown had been for several months visiting frequently at Mr. Cane's, where she had been brought in close contact with young Cane, and that Cane had visited at his house, and he would naturally think of him as the paramour alluded to by Mr. Cane. He knew that she had had frequent opportunities to indulge in improper conduct with young Cane. He would reasonably suppose from Mr. Frederick W. Cane's language that things must have already gone pretty far between the parties to justify the father of the paramour talking in that way to him. In my judgment he was justified in believing that if she was at all disposed to go astray with young Cane she had already done so. At any rate, her present situation at Red Bank subjected her to much less temptation than that at Bogota did. So that there was nothing to require hasty action, and, after all, she might not be guilty. If she was not guilty, it would be not only foolish but cruel and disastrous to charge her with it, and he had no right to do so without proof.

Then beyond all question he had the clear right to investigate, ascertain and know the truth, and to be satisfied one way or the other as to the guilt or innocence of his wife. He was, therefore, in my judgment, justified in doing just what he did— wait quietly, observe and obtain information, creating no disturbance or scandal. This right to know the truth and to take reasonable measures to ascertain it, seems to me to be the very touchstone of his subsequent conduct, and he is entitled to a charitable judgment upon it. His position was difficult and he might even make an honest and innocent mistake in the course to be adopted. I do not think he was under any obligation to warn his wife of his suspicions and so put her on guard.

His wife returned from her summer outing and was received at her home, where she was not subjected to especial temptation. And it is worth while here to go back to observe that the going away to board at Bogota was not the suggestion of the

husband, but of the wife and was faintly objected to but cheerfully acquiesced in by him.  The visit to Red Bank was without his consent.

As before, she received at her home the visits of Mrs. Van Keuren and Mr. Cane, and to all outward appearances no impropriety occurred.  She wished to go to the theatre and her husband permitted her to do so and Mr. Cane to accompany her.  He declined to permit her to go to a New York theatre. She chose Saturday night for that purpose and he acquiesced, but could not leave his store to accompany her on that evening of the week.

Mrs. Van Keuren swears that Brown suggested that his wife should have Mr. Cane go with her, calling him "her best man."

Admitting, as we must, that he used that expression, what is its significance in that connection?  Can it be treated as a dispensation to her to indulge in illicit intercourse with him? If she so understood it, then she must have understood that her husband had already adjudged her guilty and knowingly treated her as an abandoned woman who was his wife only in name.  This position his counsel at the argument positively declined to accept, and declined to put his client's case on the ground that she had actually sinned.  I think the remark was a mere pleasantry, which might well have been construed as a gentle warning.

The attitude of the parties towards each other during this period, as deduced from the evidence, is sufficiently clear.  Mr. Brown told Mr. Frederick W. Cane, at the interview in August, that if there was evidence to warrant a divorce he would take advantage of it.  This declaration was undoubtedly immediately communicated, probably through Mr. Van Keuren to Mrs. Van Keuren and Mrs. Brown, for, as we have seen, they swear that they knew at Red Bank that the petitioner was seeking a divorce. Mrs. Brown does, indeed, swear that about two weeks before her return from Red Bank (which would be about August 20th) on the occasion of one of her husband's visits to that place, she told him that she had heard that he was trying to get a divorce from her; that he would give a thousand dollars to be rid of her, and that he would consider any man his best

Brown *v.* Brown.

friend who would accomplish that result; that she asked him if it were so; that he denied it and said that if he ever wanted a divorce he would let her know first before anyone else. And here it is worth while to refer again to what Cane, Jr., swears to on the subject of learning from Miss Meehan as early as the 1st of August that there was trouble between Brown and his wife, and of his communicating that information to Mrs. Brown.

Mrs. Brown must have known at that time that the only person with whom she was liable to be charged with undue intimacy was young Cane; and she also knew the probability that Miss McCabe would report to Mr. Brown all that she had observed.

When she returned from Red Bank there was nothing to intimate any change in her husband's feelings. She swears that his coldness increased, and there was nothing in his conduct from which she had a right to conclude that he was consenting to any improper intimacy with Cane, or even willfully shutting his eyes to it, and maintaining a voluntary position of blissful ignorance. Looking at this state of affairs, I am unable to see how the permitting of Cane to accompany her to a theatre and speaking of him as her best man can be considered as a license from Brown to his wife to yield her person to Cane, or even a connivance at the act. All that Brown at that time knew upon which to found a charge against his wife was what Mr. F. W. Cane had told him, which that gentleman declares was nothing specific, and what he had probably learned from the witness McCabe. Brown had no proof at that time of the extent to which his wife had compromised herself with Cane. But what he learned from F. W. Cane and McCabe was quite sufficient to excite his suspicion.

There is, as we have seen, not the least evidence that Brown, after his wife's return from Red Bank, employed or encouraged the house servants to watch Mrs. Brown and Cane, or that he learned from them what they had observed, until after the suit was commenced. The indications are that he did not suppose that the parties would indulge their guilty passions in his own house.

Brown *v.* Brown.

His first employment of a detective was about the 5th of October. We may presume that he learned through his solicitor the result of Coyne's observations on October 15th, and we may fairly infer that he was agreeably surprised that matters had gone no further than Coyne's report would show, for it is easy to believe that he may have expected that in addition to, or instead of, going to the theatre, his wife and Cane would resort to some convenient place where they could indulge their passions.

The resuming of frequent and extended visits to Bogota, where Mrs. Brown met Cane with less restraint, were clearly not encouraged, but rather discouraged, by Brown, and evidently increased his suspicions; and here it is important to observe that Cane swears he knew for some time before November 5th that Brown had employed a detective to watch Mrs. Brown and himself.

The report of the detective of what he had seen and heard on November 5th at Mrs. Van Keuren's house at Bogota, gave the case a different aspect at once. We have seen that one of the solicitors of the petitioner called immediately on Mr. Van Keuren and told him what had been observed, and the evidence shows clearly that Mr. Van Keuren told his wife, who immediately came to visit Mrs. Brown, and a conference was there had, all before the suit was commenced. And it appears that at dinner on November 15th, or near that date, Mr. Brown announced to his wife that he was about to sue her for divorce. Her account of the interview is that she at once denied the charge, and that her husband said she would have an opportunity to meet it. But the cook, Rose Sexton, swears that Mrs. Brown said it, the suit, "was a mean, contemptible thing, and that she would go home to her mamma and papa that very night."

This review of the evidence leads me to the conclusion that the case discloses no such encouragement, connivance or acquiescence on the part of the husband as bars his remedy. I do not deem it worth while to discuss the rules defining connivance as laid down in the books. Chancellor Zabriskie does so to some extent in *Hedden* v. *Hedden, 6 C. E. Gr. 61,* and Mr. Bishop deals fully with the subject in *2 Bish. Mar., D. & S.*

In re Sleeper.

§§ *203–248*, and particularly §§ *213–215*. The petitioner was, in my judgment, perfectly justified in believing that if his wife was at all disposed to go astray she had already done so before he received notice of her disposition; and while he was not justified in placing new temptation in her way, and did not do so, he was entirely justified in refraining from warning her and in watching her as he did, for if already guilty he was of course justified in casting her off.

For these reasons I will advise a decree for the petitioner.